UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JEROME LEONARD                                    CIVIL ACTION

VERSUS                                            NO. 10-2626

MICHAEL J. ASTRUE, COMMISSIONER                   SECTION "I" (2)
OF SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Jerome Leonard, seeks judicial review pursuant to Section 405(g) of the

Social Security Act (the "Act") of the final decision of the Commissioner of the Social

Security Administration (the "Commissioner"), denying plaintiff's claim for disability

insurance benefits ("DIB") under Title II of the Act.  42 U.S.C. §§ 405(g), 423, 1381a.

This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C.

§ 636(b) and Local Rule 73.2(B).

I.    PROCEDURAL HISTORY

Leonard filed an application for DIB on August 18, 2008, alleging disability since

July 15, 2008, due to lumbar and cervical spine impairments, hypertensive cardiovascular

disease, hypertension, multiple joint arthritis, renal disease and asthma. (Tr. 104).  After

his application was denied, Leonard requested a hearing before an Administrative Law

Judge ("ALJ"), which was held on July 31, 2009.  (Tr. 20-53).  On November 4, 2009,

the ALJ issued a decision denying plaintiff's application for disability benefits.  (Tr. 8-

18).  After the Appeals Council denied review on June 16, 2010, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review. (Tr. 1-5).

II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.   The ALJ failed to follow the treating physician rule.

B.   The ALJ failed to evaluate plaintiff's credibility properly.

C.   The ALJ relied upon flawed vocational expert testimony.

III.   ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.   Leonard has severe impairments consisting of disorders of the spine, hypertension, chronic kidney disease and ventricular tachycardia.

2.   He has the residual functional capacity to perform medium work, with the limitations of climbing, stooping and crawling only occasionally.

3.   Although plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

4.   Leonard is not capable of performing his past relevant work as a cement mason.

2

5.   Jobs exist in significant numbers in the national economy and in Louisiana that Leonard can perform, including truck driver, bus or shuttle van driver and order filler.

(Tr. 13-18).

IV.   ANALYSIS

A.   Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for DIB, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2008).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[1]  The five-step

---

[1]The five-step analysis requires consideration of the following:
First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

4

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability:  (1) objective medical facts; (2) diagnoses and opinions

---

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history."  Martinez, 64 F.3d at 174.

B.    Factual Background

Leonard testified that he was diagnosed with chronic kidney disease after he became dizzy and disoriented while working on July 15, 2008.  (Tr. 24).  He stated that he was advised to discontinue any pain medications and to follow a special diet because of his kidney condition.  He said he was monitored by his treating physician, Dr. Christopher Maret, but did not receive any additional treatments for his kidney problems. (Tr. 24-25).

Plaintiff stated that he injured his neck and back in an automobile accident in November 2007.  (Tr. 25, 28).  He testified that, upon returning to work after the accident, he experienced back pain and numbness in his leg and could not walk very far. He said he was referred to Dr. Anthony Margherita, who recommended non-surgical treatment, including steroid shots. Leonard stated that an MRI revealed degenerating nerves in his back and neck and a compression fracture in his spine.  Plaintiff stated that he was misdiagnosed and that he believed that his return to work created more damage. He said that surgery was not recommended, and he was given oral medication, which was not successful.  He testified that he received three cortisone injection treatments in his

back during a six-month period, when he was living in St. Louis.  He said he had not received any injections since October 2008.

Leonard testified that he has not worked since July 15, 2008, when he was diagnosed with kidney disease.  He said that he returned to work after his auto accident because he was told at the emergency room that he was fine.  (Tr. 26-27).

Plaintiff stated that his doctor advised him not to work for one or two months when his kidney condition was diagnosed.  He testified that he cannot work now because he cannot bend, stoop or walk more than forty yards and experiences numbness in his legs upon walking greater distances.  (Tr. 28-29).  He said that Dr. Margherita told him he had pressure on his sciatic nerve, which causes tingling and numbness in both legs. Leonard stated that his physicians have not recommended surgery for his sciatic nerve. He said they have not prescribed and he does not use any ambulatory assistance devices. He stated that he has not had a chance to see a doctor in 2009 about additional cortisone shots or other treatment for his legs because he was having complications with his heart, which concerned him more.  (Tr. 30).

Plaintiff testified that he awoke with irregular heart beats and weakness in early June 2009.  He said that he fainted upon attempting to stand up from his bed and that his heart was "racing real fast."  He said he did not go to the emergency room because the problems stopped after a few minutes, but that he called his doctor and was able to see

a cardiologist, Dr. Patrick Breaux, the following day.  He testified that Dr. Breaux scheduled a stress test for a day or two later, and that "during the stress test I had a heart attack on the table."  Plaintiff testified that Dr. Breaux referred him to Dr. Timothy Donahue to interpret his electrocardiogram readings.  (Tr. 31).  He stated that Dr. Donahue said his condition was caused by "some overactive cells," which made his heart go "out of rhythm and . . . beat violently."

Plaintiff testified that he underwent corrective surgery for his heart problems at Ochsner Hospital on June 15, 2009, but it was not successful.  He could not say what type of surgery he had.  He said he takes a lot of medication for his heart condition to try to keep the problems from happening, but that the medication is not a cure.  (Tr. 32-33).

Plaintiff testified that he was concerned in late 2008, after the last cortisone shot, about his inability to walk more than 40 yards, but he did not seek medical treatment for it because he was in the process of relocating to New Orleans from St. Louis, where he had moved after Hurricane Katrina.  He said that, upon moving back to New Orleans in November 2008, he scheduled an appointment with a doctor, but was unable to get an appointment until about two months after he called.  He said he started having problems about that time with his heart, which was then his main concern.  (Tr. 34-35).

Plaintiff stated that he began seeing Dr. Breaux in February or March 2009, before his fainting episode in June 2009. He said he has seen cardiologists for the past ten years because his hypertension has enlarged his heart.

Leonard stated that Dr. Maret referred him to a hypertension specialist, Dr. Angela Brown, in St. Louis. (Tr. 35). He testified that he has taken high blood pressure medication for fourteen years and has complications "off and on." He stated that his blood pressure is sometimes high, but was dangerously low while he was having his heart and kidney problems. He said his irregular heart beat inhibited the flow of oxygen and blood to his brain, which caused him to lose consciousness.

Plaintiff testified that, on a typical day around the time of his alleged disability onset date, he would awaken about 5:00 a.m. and have coffee with his wife before she left for the day. He would sometimes do the laundry or water the flowers. He said he would sit on the patio for a while, then watch a lot of news on television. (Tr. 36). He stated that he had a driver's license and drove a sports utility vehicle with an automatic transmission at that time. He said that he did very few household chores other than laundry and that his wife did the more strenuous chores. He testified that he used to do the grocery shopping and the cooking when he would come home from work, but now his wife does most of those chores. He said he prepares meals that she has already cooked. (Tr. 37).

9

Leonard stated that he sometimes had difficulty ascending and descending the few steps to his one-story home.  He said he had particular difficulty lifting his right leg, because the cortisone shots helped his left leg, but did not help his right leg as much.  He stated that he sometimes drags his right leg, which began happening around January or February 2008 and has worsened over time.  (Tr. 38).

Plaintiff stated that his daily medications are Flexacin, Coreg and aspirin for his heart condition; Nifedipine, Lisinopril and Spironolactone for his blood pressure; Allopurinol for his gout; Doxazosin as an alpha blocker; and hydrochlorothiazide as a water pill.  He said that he takes Flexeril, a muscle relaxer, only occasionally because he does not like how it makes him feel.  (Tr. 38-39).

At the conclusion of the ALJ's questioning, Leonard asked if he could stand up.  He stated that his leg goes numb with prolonged sitting.  (Tr. 39).

Upon questioning by his attorney, plaintiff said he had taken Celebrex for back pain for years before his kidney condition was diagnosed in July 2008, and was able to work while taking Celebrex.  He testified that he had always had back trouble for which he needed pain medication, but he was taken off the medication when his kidney disease was diagnosed because he was told that it was not good for his kidneys. (Tr. 40-41).  He said it was difficult to manage the pain in his neck and back and to make it through the day without pain medication.

Leonard testified that Dr. Margherita initially gave him some steroid pills and then gave him cortisone shots when the pills did not work.  (Tr. 41).  He stated that, after a nerve conduction study and an electromyography on his legs in June 2008, his doctor said that his "legs were dead" because they would not respond at all to "the different things that [the doctor] was trying to do with the reflex deal."  (Tr. 42).  Plaintiff said that an MRI scan in January 2008 revealed a bulging disk in his back and neck and a compression fracture in his lower spine and that Dr. Margherita advised him not to lift anything or exercise for a while, which Leonard said he could not do anyway.  He stated that he had told Dr. Margherita that Dr. Maret had already recommended that plaintiff not go back to work.

Leonard stated that he cannot stand for more than ten to fifteen minutes.  (Tr. 42-43).  He said his health continued to deteriorate after his automobile accident until he could no longer work.  He said it was not too bad at first, but he thinks that he aggravated his problems by going back to work.  He stated that, after his two hernia surgeries in August 2008, he was advised not to lift more than ten pounds because the hernias could always come back.  He testified that his doctor told him to use his discretion and that, over time, he might be able to lift slightly heavier objects.  (Tr. 44).

Plaintiff said he could only lift about five pounds without pain.  He testified that he has pain in his lower back, right leg and sometimes in his neck and shoulders.  He

stated that he uses over-the-counter patches and daily hot baths to take the edge off his pain and make it tolerable during the day.

Leonard said that lying down is his most comfortable position and that he has to lie down to watch an entire television program during the day.  (Tr. 45).  He stated that he has to stand up after sitting for ten to twenty minutes, but that he can sit longer than he can stand.  At the hearing, he again asked the ALJ if he could stand up for a few minutes because his legs were going to sleep.

Plaintiff testified that he experiences constant stiffness in his neck and that he cannot twist his right shoulder.  He stated that he has difficulty bending over to pick something up from the floor, but he can do it by stooping with his legs.  (Tr. 46).  He said that he has occasional dizziness as a result of his medications, which has worsened with the most recent medication that was prescribed.  He said his physician has recommended that he refrain from driving.  He also complained of fatigue, which he said was probably caused by the combination of his medications and his heart condition.  (Tr. 47).  He said he still has fatigue as a side effect of his medications.  (Tr. 48).

Plaintiff stated that his work was his life for 37 years.  He said that his work gave him a sense of accomplishment and self-worth as both a provider and a citizen.  He stated that, after his automobile accident, he had two hernia operations, kidney disease and a spinal fracture, all of which caused his health to deteriorate, and that he now has heart

problems and hypertension.  Plaintiff stated that his previous salary was $1100 per week after taxes and he needed to "settle" for that amount.  (Tr. 51-52).

C.    Vocational Expert Testimony

A vocational expert, John M. Yent, testified at the hearing that plaintiff's past relevant work as a cement mason was skilled work at a heavy exertional level.  The ALJ posed a hypothetical of an individual with the residual functional capacity to perform medium level[2] work, with only occasional climbing, stooping or crawling.  Yent testified that such a person could not perform plaintiff's past relevant job as a cement mason. (Tr. 48).   He stated that a wide range of medium exertional jobs exists that the hypothetical person could perform, such as truck, bus or shuttle van driver and order filler.  (Tr. 49).

Upon cross-examination, plaintiff's attorney modified the hypothetical to reflect a residual functional capacity at the light level.[3]  Yent testified that such a person could

---

[2]"Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. § 404.1567(c).  One who can perform medium work can necessarily also perform light and sedentary work.  Id.

[3]"Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  A job is also in this category if it involves very little lifting but requires "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(a).  To be considered capable of performing a full or wide range of light work, the claimant "must have the ability to do substantially all of these activities."  Id.

13

not perform plaintiff's past relevant work and would have no transferable skills from his previous masonry work to the light exertional level.  (Tr. 50).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 14-15).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

    1.    The ALJ Had Good Cause to Reject the Treating Physician's Checklist Opinions

Plaintiff argues that the ALJ improperly failed to give controlling weight to the opinions of his treating sources.  Specifically, he argues that the ALJ failed to accept the opinions of Christopher Maret, M.D., plaintiff's treating internist,[4] on a Multiple Impairment Questionnaire dated August 28, 2008, in which Dr. Maret stated that plaintiff has severe, constant back and leg pain; is limited to lifting a maximum of five pounds occasionally; can only stand, walk or sit for a maximum of one hour in an eight-hour workday; and will not be able to return to work because of his back pain and

---

[4]The website for Washington University Physicians in St. Louis indicates that Dr. Maret is a board-certified internist.  http://wuphysicians.wustl.edu/physician2.aspx?PhysNum=2852 (last visited on August 22, 2011).

14

degenerative disc disease.  (Tr. 221-23).  Plaintiff also contends that the ALJ erred in

apparently rejecting the assessments of another treating physician, Anthony Margherita,

M.D., a board-certified specialist in physical medicine and rehabilitation to whom

plaintiff was referred by Dr. Maret.  Leonard argues that the ALJ failed to address the

factors in 20 C.F.R. § 404.1527(d) when rejecting the treating doctors' opinions.

> Generally,
>
> [t]he opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. . . .
>
> . . . . [T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  The treating physician's opinions are not conclusive.  The opinions may be assigned little or no weight when good cause is shown.  Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

Newton, 209 F.3d at 455-56 (quotations and citations omitted).

Dr. Maret's opinions on which plaintiff relies are contained in a "Multiple

Impairment Questionnaire" that Dr. Maret completed on August 26, 2008.  (Tr. 221-28).

On this checklist form, Dr. Maret noted that he had diagnosed Leonard with

hypertension,[5] high cholesterol, degenerative joint disease, severe back pain, sciatica,[6] diastolic dysfunction and erectile dysfunction.   Dr. Maret stated his prognosis that plaintiff is "not going to be able to [return to work] because of back pain and [degenerative joint disease]" and because he is "in constant pain despite [medication.]" (Tr. 221).  Dr. Maret stated that Leonard's primary symptoms since July 1, 2008 are pain in his low back and legs, weakness and dizziness.  Dr. Maret circled a range of zero to one hours as plaintiff's full capacity to sit or stand and/or walk in an eight-hour workday. He described Leonard's pain as both constant and severe, and also rated plaintiff's fatigue as severe.  Dr. Maret opined that Leonard can lift up to five pounds occasionally. He checked off that plaintiff has marked limitations in grasping, turning or twisting objects with both of his hands; using both hands for fine manipulation; using both arms for reaching; can never push, pull, kneel, bend or stoop; and must avoid heights.   He checked off that plaintiff's pain, fatigue or other symptoms are constantly severe enough to interfere with his attention and concentration, and that Leonard cannot tolerate even

---

[5]Hypertension is high arterial blood pressure.  Dorland's Illustrated Medical Dictionary 858 (29th ed. 2000) (hereinafter Dorland's).

[6]Sciatica is "a syndrome characterized by pain radiating from the back into the buttock and into the lower extremity . . . , most commonly caused by protrusion of a low lumbar intervertebral disk."  Id. at 1609 (29th ed. 2000).

16

low work stress.  Dr. Maret concluded that plaintiff can never engage in a full-time competitive job and is not able to work.

The ALJ found that Dr. Maret's report "is wholly without objective support and is thereby given no weight" because Dr. Maret's listing of plaintiff's functional limitations was based on "plaintiff's subjective allegations of pain and not on objective examination findings."  Contrary to plaintiff's argument that the ALJ also rejected Dr. Margherita's opinions, the ALJ actually relied on Dr. Margherita's opinions concerning plaintiff's prognosis and functional limitations, which contradicted Dr. Maret's opinions and were more consistent with the evidence as a whole.  (Tr. 15).  The ALJ gave "considerable weight" to the opinion of a non-examining doctor, Dennis McGraw, D.O., who reviewed the medical evidence at the agency level and opined on November 10, 2008, that Leonard had the physical functional capacity to perform work at a medium exertional level, with some restrictions on climbing, stooping and crawling.  (Tr. 285-90).  The ALJ held that the functional limitations found by Dr. McGraw were not altered by the newer evidence that was entered in the record after Dr. McGraw's review.

Substantial evidence supports the ALJ's decision to reject Dr. Maret's opinions on the form questionnaire.  First, appellate courts have often held that checklist opinions are unworthy of credence when they are not adequately supported by or are inconsistent with the medical records.  See Peck v. Barnhart, 214 F. App'x 730, 738 (10th Cir. 2006)

17

(The ALJ provided legitimate reasons for rejecting a doctor's opinion consisting "of checked boxes and circled numbers on a form" when the "opinion was not supported with additional explanation" nor justified by the doctor's treatment notes.); Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) ("the checklist format, generality, and incompleteness of the assessments limit their evidentiary value"); Johnson v. Apfel, 189 F.3d 561, 564 (7th Cir. 1999) (upholding ALJ's rejection of physician's check-box form when it was contradicted by evidence in the record); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (quotation omitted) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best. . . . [When] these so-called reports are unaccompanied by thorough written reports, their reliability is suspect . . . ."); Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987) ("Such evaluation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence."); cf. Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010) (citing Johnson, 189 F.3d at 564; Mason, 994 F.2d at 1065) ("Although by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records. . . .  Here, there is a long record of treatment by [the treating physician] that supports his notations on the form.").

Second, as the ALJ stated, Dr. Maret's opinions are not substantially consistent with the objective evidence, which does not document specific spinal cord compression,

nerve root impingement or other neurological defects.   Radiographic imaging on January 24, 2008, revealed moderate to severe multilevel degenerative disc disease of plaintiff's cervical spine and moderate multilevel degenerative disc disease of his lumbar spine, with no other abnormal findings.  (Tr. 211-12).  A SPECT[7] bone scan on April 3, 2008, performed by Dr. Margherita indicated facet osteoarthropathy[8] at the L2-3 and L4-5 levels of plaintiff's lumbar spine and a probable compression fracture of the thoracic spine near the T9 level, but no sacroiliac joint pathology.  (Tr. 191-92).  An EMG study on June 25, 2008, was "abnormal," with findings "suggestive but not clearly diagnostic of a neuropathic problem at or near" plaintiff's intervertebral foramen[9] at the L5 level, "matching the clinical impression of root level pathology at the L5-S1 level."  (Tr. 190). On December 2, 2009,[10] an MRI of plaintiff's thoracic spine revealed multilevel degenerative disc disease with mild disc bulges at all levels, without any spinal cord

---

[7]Single photon emission-computed tomography.

[8]A facet is a small plane surface on a hard body, such as a bone.  Dorlands at 642.  The vertebral facets are the plane surfaces at the end of the joint processes in the spine where the bones connect, and are sometimes called facet joints.  J. Stanley McQuade, Medical Proof of Damages & Disability 143 (Prof. Educ. Sys. Inc.).  Osteoarthropathy is any disease of the joints and bones.  Dorlands at 152.

[9]A foramen (pl. foramina) is a natural opening or passage, especially into or through a bone.  Id. at 696.

[10]Although this test was done after the ALJ rendered his decision, it was considered by the Appeals Council. (Tr. 5).

impingement or foraminal compromise, and a mild, old compression fracture at T7-8. (Tr. 347).

Furthermore, Dr. Maret's opinions are not substantially supported by either his own treatment notes or the remainder of the medical records.  Dr. Maret's treatment records show that Leonard repeatedly had normal physical examinations, with a full range of motion in his back with some pain, negative straight leg raising tests bilaterally and normal neurological findings.  (Tr. 229, 232, 236, 239, 244, 259, 301).  Dr. Maret also noted that plaintiff's lower back pain improved significantly after he received an epidural cortisone injection in June 2008, although some pain returned and plaintiff later developed new symptoms in his right leg.  (Tr. 229, 232, 236, 244, 269).

Plaintiff stated on a questionnaire dated March 24, 2008, while he was still working as a cement mason, that his back pain was "bad but manageable without painkillers." (Tr. 187).  He complained of back and bilateral leg pain at his first visit to Dr. Margherita on that date.  Dr. Margherita noted that Leonard had restricted lumbar mobility and positive facet findings, but his neurovascular examination was unremarkable and he had no neural tension signs.  (Tr. 181).

On his next visit to Dr. Margherita on May 23, 2008, plaintiff's status and symptoms were unchanged.  The doctor prescribed a tapering course of oral prednisone and hydrocodone for pain.  (Tr. 180).  On June 5, 2008, Leonard told Dr. Margherita that

20

the prednisone had helped for a little while and that he could not take the pain pills because they made him too groggy to work.  Dr. Margherita then scheduled a nerve conduction study and EMG and epidural cortisone injections.  (Tr. 178).

On plaintiff's alleged disability onset date of July 15, 2008, he saw Dr. Maret, complaining of muscle weakness and an inability to complete his activities of daily living or to work.  Dr. Maret diagnosed muscle weakness, shortness of breath, hypertension (although noting that plaintiff's blood pressure was lower than usual), dizziness and orthostatic[11] hypotension,[12] with no evidence of ischemic[13] etiology.  At this and plaintiff's next two visits on July 18 and 22, 2008, when he complained of overwhelming fatigue and generalized weakness, Dr. Maret advised Leonard not to return to work until a possible cardiac etiology for his symptoms could be ruled out or addressed.  Dr. Maret did <u>not</u> mention chronic back pain as a reason that plaintiff should refrain from work.  Indeed, Dr. Maret noted some improvement in plaintiff's back pain and encouraged him to engage in regular physical activity.  (Tr. 232-35, 236-38, 239-42).

Leonard returned to see Dr. Maret on August 7, 2008, when he reported that his overall energy level was slightly improved and that the cortisone shots had helped

---

[11]Orthostatic means "pertaining to or caused by standing erect."  <u>Dorland's</u> at 1281.

[12]Hypotension is abnormally low blood pressure.  <u>Id.</u> at 867.

[13]Ischemia is a "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel."  <u>Id.</u> at 920.

somewhat.  However, some pain had recurred, for which he was continuing to work with Dr. Margherita.  (Tr. 247-49).  On September 4, 2008, Dr. Maret noted that plaintiff's back pain was much improved.  (Tr. 244-46).  At his next visit on September 30, 2008, Dr. Maret recommended that Leonard use pain medication only as needed and that he would benefit from exercise.  (Tr. 301-03).

Plaintiff saw Dr. Margherita on October 9, 2008.  The doctor noted that Leonard had obtained "excellent results" from his epidural steroid injection and that his lumbosacral status was improved.  Dr. Margherita recommended that Leonard have another injection to address his recently developed right leg symptoms.  However, no such injection ever occurred.  Dr. Margherita observed that plaintiff had not been working since July 15, 2008 because of his drop in blood pressure on that date, not because of his back pain.  (Tr. 269).

On October 8, 2008,[14] Dr. Margherita completed a form "Spinal Impairment Questionnaire" similar to the one completed by Dr. Maret.  However, Dr. Margherita's opinions regarding plaintiff's functional limitations differed significantly from Dr. Maret's.  (Tr. 262-69).  Dr. Margherita diagnosed plaintiff with lumbar facet arthropathy,

---

[14]This probably should be October 9, 2008, as Dr. Margherita indicates on the form that his most recent treatment of plaintiff was on that date.

a compression fracture at T9 and degenerative disc disease with foraminal stenosis.[15]  He opined that plaintiff's prognosis for improvement was fair to good, based on plaintiff's response to the steroid injection for his left-sided symptoms, and pending treatment for the new right leg symptoms.  Although he noted plaintiff's lumbar tenderness, limited lumbar range of motion and a recent positive straight leg raising test on the right, Dr. Margherita also noted plaintiff's past improvement with treatment.  He opined that Leonard could lift and carry up to ten pounds frequently and up to fifty pounds occasionally, sit for three hours out of an eight-hour work day, stand and/or walk for three hours out of an eight-hour work day, and tolerate moderate work stress.  Dr. Margherita further stated that Leonard could sustain a full time competitive job, provided that he refrain from stooping and bending at the waist.  Finally, in Dr. Margherita's expert opinion, plaintiff's "primary limitations are more likely due to his medical status (kidneys, etc.)," than his spinal conditions.

At his final visit to Dr. Maret on November 19, 2008 before moving back to New Orleans, Leonard reported a recent episode of a few minutes of dizziness.  However, Dr. Maret stated that there was no evidence of any acute neurological or cardiac event, no acute change on EKG and no orthostatic drop in blood pressure.  Dr. Maret did not even

---

[15]Stenosis is an abnormal narrowing of a duct or canal.  Id. at 1698.

include back pain in his review of plaintiff's problems or in his diagnoses. (Tr. 298-300). Plaintiff did not seek any treatment for back or leg pain after that visit.

On April 29, 2009, Leonard saw cardiologist, Patrick Breaux, M.D. His physical examination was normal, including specifically his gait. Dr. Breaux stated that Leonard could exercise without limitation and should start doing so. (Tr. 340).

Dr. Maret's opinions on the questionnaire regarding Leonard's impairments and his conclusion that Leonard is not able to work does not explain the diagnoses, objective tests and clinical findings on which his statements are based, and add nothing to the medical evidence that the ALJ did not already consider. Contrary to plaintiff's argument, Dr. Maret's opinions on his checklist form are contradicted by substantial medical evidence, including his own treatment notes and the opinions of Dr. Margherita and the non-examining physician, Dr. McGraw. "State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f)(2)(i). "Although ALJs 'are not bound by any findings made by State agency medical or psychological consultants,' they must consider such findings as opinion evidence." Alejandro v. Barnhart, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003) (quoting 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i)); accord Butler v. Barnhart, 99 F. App'x 559, 560 (5th Cir. 2004) (citing 20 C.F.R. §

404.1527(f)(2)(i).  Because Dr. Maret's opinions were conclusory and unsupported by medically acceptable clinical, laboratory, or diagnostic evidence, the ALJ had good cause to reject them.  Newton, 209 F.3d at 456.

Moreover, a physician's statement that a patient is unable to work does not mean that the patient is disabled for purposes of the Act, because that is a determination that may be made only by the Commissioner.  Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003); Chambliss, 269 F.3d at 522.

> [S]ome opinions by physicians are not medical opinions, and as such have no "special significance" in the ALJ's determination.  Among the opinions by treating doctors that have no special significance are determinations that an applicant is "disabled" or "unable to work."  These determinations are legal conclusions that the regulation describes as "reserved to the Commissioner." . . .  The doctor's opinion [that plaintiff could not work] was not a medical opinion within the meaning of the regulation.

Frank, 326 F.3d at 620 (quoting 20 C.F.R. § 404.1527(e), (1) & (e)(3)).

As he is obligated to do, Newton, 209 F.3d at 452, the ALJ weighed the medical evidence and resolved any conflict in favor of the opinions contained in the treatment notes of Drs. Maret and Margherita, rather than the conclusory and unsupported opinions of Dr. Maret, and in favor of the opinions of both Drs. Margherita and Dr. McGraw. Escalante v. Astrue, 286 F. App'x 179, 180 (5th Cir. 2008) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)); see also 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in your case record,

25

including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have.").

Substantial evidence therefore supports the ALJ's decision regarding the weight to be accorded to the opinions of the treating physicians.

### 2.   The ALJ's Evaluation of Plaintiff's Credibility

The ALJ found that, although plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the ALJ's residual functional capacity assessment. Leonard argues that the ALJ failed to follow the procedures of Security Ruling 96-7p because he did not consider the entire case record and did not give specific reasons for his credibility findings. Plaintiff contends that the ALJ should have accepted his testimony about his physical limitations as credible because his various diagnoses support the existence of his symptoms and limitations. For the following reasons, I find that the ALJ properly applied the law regarding plaintiff's credibility.

First, the mere diagnosis of an impairment does not establish a claimant's disability claims. Bordelon v. Astrue, 281 F. App'x 418, 421 (5th Cir. 2008) (citing Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983)); McLendon v. Barnhart, 184 F.

App'x 430, 431(5th Cir. 2006); <u>Harris v. Barnhart</u>, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); <u>Estok v. Apfel</u>, 152 F.3d 636, 640 (7th Cir. 1998); <u>Jones v. Sullivan</u>, 954 F.2d 125, 128 (3d Cir. 1991); <u>Arroyo v. Sec'y of Health & Human Servs.</u>, 932 F.2d 82, 87-88 (1st Cir. 1991); <u>Martin v. Chater</u>, No. 95 C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995) (citing <u>Anderson v. Sullivan</u>, 925 F.2d 220, 222 (7th Cir. 1991)).  Plaintiff "must show that [he] was so <u>functionally impaired</u> by [his diagnosed impairment] that [he] was precluded from engaging in any substantial gainful activity." <u>Id.</u> (emphasis added); <u>accord</u> <u>Bordelon</u>, 281 F. App'x at 421 (citing <u>Hames</u>, 707 F.2d at 165); <u>Anthony v. Sullivan</u>, 954 F.2d 289, 293 (5th Cir. 1992).

In addition, pain may constitute a non-exertional impairment that can limit the jobs a claimant would otherwise be able to perform.  <u>Carnahan v. Apfel</u>, 247 F.3d 241, 2001 WL 43543, at *3 (5th Cir. 2001); <u>Selders v. Sullivan</u>, 914 F.2d 614, 618 (5th Cir. 1990); <u>Carter v. Heckler</u>, 712 F.2d 137, 141-42 (5th Cir. 1983).  However, the mere existence of pain does not establish disability.  "Pain constitutes a disabling condition when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'"  <u>Falco v. Shalala</u>, 27 F.3d 160, 163 (5th Cir. 1994) (quoting <u>Selders v. Sullivan</u>, 914 F.2d 614, 618-19 (5th Cir. 1990)); <u>accord</u> <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2001).  Subjective complaints of pain or other symptoms must be corroborated by objective medical evidence, <u>Quijas v. Astrue</u>, 298 F. App'x 391, 393 (5th Cir. 2008)

27

(citing <u>Chambliss</u>, 269 F.3d at 522), and such complaints may be discounted when the alleged symptoms are not consistent with the objective medical evidence.  <u>Brown v. Astrue</u>, 344 F. App'x 16, 21 (5th Cir. 2009); <u>Hernandez v. Astrue</u>, 278 F. App'x 333, 340 (5th Cir. 2008) (citing <u>Anthony</u>, 954 F.2d at 295); <u>Dunbar v. Barnhart</u>, 330 F.3d 670, 672 (5th Cir. 2003).

It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference.  <u>Jenkins v. Astrue</u>, 250 F. App'x 645, 647 (5th Cir. 2007) (citing <u>Chambliss</u>, 269 F.3d at 522); <u>Wren v. Sullivan</u>, 925 F.2d 123, 128 (5th Cir. 1991); <u>James v. Bowen</u>, 793 F.2d 702 (5th Cir. 1986).  Whether an applicant is able to work despite some pain is within the province of the administrative agency, and the agency's determination should be upheld if supported by substantial evidence.  <u>Jenkins</u>, 250 F. App'x at 647; <u>Chambliss</u>, 269 F.3d at 522; <u>Jones v. Heckler</u>, 702 F.2d 616 (5th Cir. 1983).

Regarding the effect of 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p on an ALJ's credibility findings, the Fifth Circuit has held that the ALJ is bound to explain his reasons for rejecting a claimant's subjective complaints, but "is not required to 'follow formalistic rules in his articulation.'"  <u>Hernandez</u>, 278 F. App'x at 339 (quoting <u>Falco v. Shalala</u>, 27 F.3d 160, 164 (5th Cir. 1994)).  The ALJ has the responsibility to evaluate the credibility of witnesses, <u>Masterson v. Barnhart</u>, 309 F.3d

267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'" Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164).  Thus, the ALJ's credibility evaluation is entitled to considerable deference by this court.  McKnight v. Astrue, 340 F. App'x 176, 181 (5th Cir. 2009); Bedford v. Astrue, 236 F. App'x 957, 962 (5th Cir. 2007).  The ALJ's explanation of his reasons for finding plaintiff not entirely credible is all that is required.  James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 163); Godbolt v. Apfel, No. 98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999) (Vance, J.).

Here, the ALJ reviewed the entire record and explained at length why he found that Leonard's subjective symptoms and limitations were not credible to the extent alleged.  The ALJ noted that Leonard's subjective complaints were inconsistent with the clinical and objective findings, including the results of physical examinations by his treating physicians, which revealed pain in plaintiff's cervical and lumbar range of motion, repeated negative straight leg raising test, normal sensory examinations and gradual improvement in his pain symptoms after treatment; MRI studies of his cervical and lumbar spine, which showed degenerative disc disease with no neurological deficiencies; his ability to ambulate normally; his lack of a need for prescription pain medication; his history of conservative, non-surgical treatment; the absence of

29

complaints of numbness or tingling in the medical records; and his lack of any treatment for back and leg pain since 2008.  A claimant's lack of need for medication or failure to seek treatment is a relevant factor to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain or other limitations.  Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Anthony v. Sullivan, 954 F.2d 289,  295 (5th Cir. 1992); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).

The ALJ complied with the legal standards for assessing plaintiff's credibility and adequately explained his reasons for finding Leonard's testimony about his symptoms and functional limitations not credible.  Accordingly, this assignment of error lacks merit.

### 3.    The ALJ's hypothetical question to the vocational expert

The ALJ posed a hypothetical to the vocational expert that accounted for plaintiff's age, education, work experience and functional limitations that the ALJ found credible.  The vocational expert, John M. Yent, testified that such a claimant could not perform plaintiff's past relevant work as a cement mason, but could work as a truck driver, bus or shuttle van driver and order filler. Yent testified that these jobs exist in significant numbers in both the national and local economies.

At the hearing, plaintiff was represented by counsel, who questioned the vocational expert.  Although plaintiff's attorney failed to clarify the specific limitations included in his hypothetical questions to the vocational expert, the attorney proposed that the hypothetical should reflect a light functional capacity rather than the medium capacity assessed by the ALJ after considering the medical record and objective evidence.

An ALJ's hypothetical question is defective and will not be allowed to stand unless it reasonably incorporated all of the disabilities recognized by the ALJ, "and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994); accord Zimmerman v. Astrue, 288 F. App'x 931, 938 (5th Cir. 2008); Boyd v. Apfel, 239 F.3d 698, 706-07 (5th Cir. 2001).

As discussed in the preceding section of this report and recommendation and in the ALJ's opinion, substantial medical evidence does not support plaintiff's contentions that he can stand for only one hour in an eight-hour workday, lift no more than five pounds occasionally and sit for no more than one hour each day.  The ALJ adequately explained his assessment of plaintiff's credibility, which is supported by substantial

evidence.  Therefore, the ALJ was not required to incorporate a limitation to light work in his hypothetical questions.  <u>Zimmerman</u>, 288 F. App'x at 938; <u>Carey v. Apfel</u>, 230 F.3d 131, 143 (5th Cir. 2000).

The vocational expert's testimony is substantial evidence on which the ALJ can properly rely to determine that plaintiff can perform jobs that exist in substantial numbers in the national and local economy.  Accordingly, this assignment of error lacks merit.

<u>CONCLUSION</u>

The ALJ was not required to give controlling weight to the opinions of plaintiff's treating sources that either were not medical opinions or that conflicted with the substantial evidence of record.  The ALJ applied the proper legal standard to determine plaintiff's credibility.  The ALJ's hypothetical question to the vocational expert was supported by substantial evidence.

**<u>RECOMMENDATION</u>**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and

legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[16]

New Orleans, Louisiana, this _____24th_____ day of August, 2011.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[16]Douglass referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.